# Supreme Court of Florida

--------

No. SC2024-1099

--------

**RICHARD WALLACE RHODES,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

July 2, 2026

PER CURIAM.

Richard Wallace Rhodes, convicted of first-degree murder and sentenced to death, appeals the circuit court's denial of his successive motion for postconviction relief under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.; *see also State v. Fourth Dist. Ct. of Appeal*, 697 So. 2d 70, 71 (Fla. 1997) (holding "that in addition to our appellate jurisdiction over sentences of death, we have exclusive jurisdiction to review all types of collateral proceedings in death penalty cases"). For the reasons explained below, we affirm.

**I.**

On March 2, 1984, a Florida Highway Patrol officer stopped Rhodes while he was driving a vehicle registered to a woman named Karen Nieradka. *Rhodes v. State* (*Rhodes I*), 547 So. 2d 1201, 1202 (Fla. 1989). Rhodes was arrested for driving without a valid driver's license and held at the Citrus County Jail.

Several weeks later, on March 24, Nieradka's decomposing body was found in debris being used to construct a berm in St. Petersburg. The debris came from the Sunset Hotel in Clearwater, which had been demolished on March 15. Nieradka was identified through her fingerprints. The medical examiner determined that manual strangulation was Nieradka's cause of death and that she had likely died two to eight weeks earlier. On March 26, detectives from the Pinellas County Sheriff's Office interviewed Rhodes at the Citrus County Jail. During this and subsequent interviews, Rhodes gave different and sometimes conflicting statements to his interviewers. He always denied that he raped or killed Nieradka.

After an initial investigation, Rhodes was arrested for the first-degree murder of Nieradka on April 27. During the ride from the Citrus County Jail to Pinellas County, Rhodes offered to tell

Detective Steve Porter how Nieradka had died if he could be guaranteed that he would spend the rest of his life in a mental health facility. Rhodes then claimed that Nieradka died accidentally when she fell three stories at the Sunset Hotel.

The case proceeded to a jury trial. At trial, several of Rhodes's fellow inmates at the Pinellas and Citrus County Jails were called as witnesses for the State. Two of those witnesses were Edward Cottrell and Harvey Duranseau. Both Cottrell and Duranseau testified about the incriminating statements that Rhodes made to them. Cottrell testified that Rhodes confessed to murdering Nieradka. Two other inmates also testified that Rhodes admitted to killing Nieradka. Rhodes was convicted of first-degree murder and sentenced to death. *Id.* at 1203. On direct appeal, this Court affirmed Rhodes's conviction but remanded for a new sentencing proceeding. *Id.* at 1208. At the new proceeding, Rhodes again received a death sentence. *Rhodes v. State* (*Rhodes II*), 638 So. 2d 920, 923 (Fla. 1994). This Court affirmed the sentence. *Id.* at 927.

In 2023, Rhodes filed a successive[1] rule 3.851 motion for

---

    1. We affirmed the denial of Rhodes's two previous postconviction motions. *See Rhodes v. State* (*Rhodes III*), 986 So.

postconviction relief, raising several claims.  With that motion, Rhodes attached three affidavits.  The first affidavit was from Duranseau, who claimed that when he was arrested in Citrus County, the State seized his property.  Duranseau claimed that Detective George Simpson offered his property back if he testified against Rhodes.  The second affidavit, which was also from Duranseau, made similar allegations.  He further claimed that Simpson took him and his brother, Ronald Jones, who was also in custody at the Citrus County Jail, to a private room and questioned them about Rhodes.  Duranseau claimed that there, Simpson made several statements tying Rhodes to the murder and suggested that the brothers testify for the State.  Duranseau claimed that Simpson told them that he would consider their "help in this matter" in deciding whether to return their seized property.

The third affidavit was from Cottrell.  In this affidavit, Cottrell claimed that the State directed him to get information from Rhodes. He claimed that various law enforcement officers and assistant state attorneys "coached and manipulated" him in the case.  He

---

2d 501 (Fla. 2008); *Rhodes v. State* (*Rhodes IV*), 234 So. 3d 554 (Fla. 2018).

stated that they told him what information they needed from Rhodes, what questions to ask Rhodes, and what to testify about at Rhodes's trial. He also asserted that they provided him with key facts about the case. He added that in exchange for his help with the case, the assistant state attorneys promised that he would get a lighter sentence for his own criminal case. He also claimed that he received commissary items and other benefits at the jail. Cottrell stated that contrary to his trial testimony, Rhodes told him that he did not commit the murder. He also claimed that after he was released from jail, the State wanted him to testify at Rhodes's rehearing. He asserted that the defense never contacted him. He claimed that for resentencing, the State told him what to say but he refused to do so.

Based on these affidavits, Rhodes moved for postconviction relief, raising three constitutional claims and one claim of newly discovered evidence. The postconviction court held an evidentiary hearing on Rhodes's claims. Rhodes presented the testimony of eight witnesses, while the State called six witnesses. Rhodes's witnesses consisted of his counsel at resentencing, his original trial counsel, and six jailhouse witnesses. Both Rhodes's counsel at

resentencing and his original trial counsel testified that before the affidavits, they were unaware of Cottrell's and Duranseau's claims. The jailhouse witnesses were Cottrell, Duranseau, and Jones, as well as Henry Niblack, James Head, and Randall Neeld. Duranseau testified that while he was at the Citrus County Jail, he stayed in the same cell block as Rhodes and learned of Rhodes's pending case in Pinellas County. At some point, a detective from Citrus County approached him at the jail. According to Duranseau, the detective indicated that Duranseau could retrieve some of his property that the State had seized if he spied on Rhodes. This property allegedly included a truck, a house trailer, 55 ounces of pure gold, 1,000 ounces of pure silver, and about $14,000 in cash.

At the time when the detective approached him, Rhodes had said nothing incriminating to Duranseau. Duranseau testified that the detective told him that Rhodes was "a real rascal" and "a violent homosexual." He also claimed that the detective told him that Rhodes was suspected of "breaking into old women's houses and killing them." Duranseau claimed that the detective gave him a bottle of liquor at their first meeting with the expectation that he would get "Rhodes drunk and get admissions from him."

Duranseau claimed that he followed these instructions. Duranseau recalled that he did not testify at trial about any of these claims.

Jones testified that it was a police officer named George Simpson who approached him and Duranseau about Rhodes. Like Duranseau, Jones claimed that Simpson gave them a bottle of whiskey and told them if they testified against Rhodes, they would get their property back. Jones did not recall Rhodes making any incriminating statements to him.

Cottrell also testified about the contents of his affidavit, claiming that his trial testimony was "manufactured by the State" and that Rhodes never confessed to killing Nieradka. He testified that the State asked him early on to gain information from Rhodes. He claimed that he then gained information for several weeks before meeting with State Attorney Bruce Young. In that meeting, Young allegedly told him that Rhodes had committed the murder. Cottrell claimed that he was under the impression that the State "knew what [it was] talking about" and went along with what it was asking him to do. He claimed that because of his testimony, he received commissary items and was able to "walk around" in jail and be a janitor. In exchange for his testimony, Cottrell claimed that the

State told him that he would receive two years of prison time and probation. He did not receive either.

Cottrell claimed that the State contacted him in 1990 or 1991, after he was released from prison, to appear at a hearing about Rhodes's case. The State paid for a rental car for him to travel to Pinellas County. When he arrived, the State provided him with a statement to read. Cottrell testified that he argued with Young and told him that he would not read the statement. Because he declined to read the statement, Cottrell claimed that the hearing went on without his testimony.

As for the defense's other witnesses, Niblack testified that Rhodes never discussed his case with him or made any incriminating statements. This claim was contrary to a police report where an officer wrote that Niblack had told him that Rhodes made incriminating statements. Niblack denied ever making such statements. Similarly, Head testified that he never discussed Rhodes's case with either Rhodes or law enforcement. He claimed that he was just made aware that he was mentioned in a police report. Finally, Neeld testified that he was incarcerated with Rhodes and Duranseau. He claimed that while inmates often

discussed their cases, they did not go into detail. Neeld claimed that he heard Rhodes say that he was innocent. Other than Cottrell and Duranseau, none of the jailhouse witnesses testified at Rhodes's trial.

On the other hand, the State presented Bruce Hauck, Bruce Young, Fred Zinober, Steve Porter, Walter Kelly, and George Simpson. Young and Zinober were previously with the State Attorney's Office and prosecuted the murder of Nieradka, while the remaining witnesses were former detectives with the Citrus and Pinellas County Sheriff's Offices. The State's witnesses denied all of Cottrell's, Duranseau's, and the other witnesses' claims.

Following the hearing, the postconviction court denied relief for all of Rhodes's claims, concluding that Rhodes's jailhouse witnesses were not credible. The postconviction court also denied Rhodes's motion for rehearing. This appeal follows.

## II.

Rhodes raises four claims on appeal: (A) the State withheld material and exculpatory evidence and knowingly presented false or misleading evidence; (B) the State presented or failed to correct false testimony; (C) the State elicited statements through state agents;

and (D) the witness affidavits constitute newly discovered evidence and entitle him to a new trial.[2]

## A.

Rhodes first contends that the State violated *Brady v. Maryland,* 373 U.S. 83 (1963), by withholding material exculpatory evidence.  His claim has two parts.

## 1.

First, Rhodes asserts that the information in Duranseau's and Cottrell's affidavits was never revealed to trial counsel and was therefore suppressed by the State.  He argues that this information was favorable impeachment evidence.  He also claims that the information was material and demonstrates that Duranseau and Cottrell were state agents.  Without these affidavits, Rhodes asserts, there is little evidence that he committed the murders.

Under *Brady,* the State is required to disclose material

---

2. The State asserts that Rhodes's first and third constitutional claims were procedurally barred because he previously raised the same claims.  We note that the postconviction court may deny a claim as procedurally barred when the defendant attempts to relitigate an issue that he has previously raised. *Barwick v. State,* 361 So. 3d 785, 793 (Fla. 2023) (explaining that it is inappropriate to use "a different argument to relitigate the same issue" (citing *Medina v. State,* 573 So. 2d 293, 295 (Fla. 1990))).

information within its possession or control that is favorable to the defense. *Walton v. State*, 3 So. 3d 1000, 1009 (Fla. 2009) (citing *Mordenti v. State*, 894 So. 2d 161, 168 (Fla. 2004)). To establish a prima facie case under *Brady*, Rhodes must show "that (1) either exculpatory or impeaching evidence, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced." *Davis v. State*, 26 So. 3d 519, 531 (Fla. 2009). In reviewing these claims, we defer to the postconviction court's factual findings when they are supported by competent, substantial evidence, and review the legal application of those facts de novo. *Lightbourne v. State*, 841 So. 2d 431, 437-38 (Fla. 2003) (quoting *Stephens v. State*, 748 So. 2d 1028, 1031-32 (Fla. 1999)); *see also Lambrix v. State*, 39 So. 3d 260, 272 (Fla. 2010) (applying the competent, substantial evidence standard to a case involving the credibility of a recantation).

The postconviction court found that neither Cottrell nor Duranseau were credible witnesses and rejected Rhodes's claim on that basis. It has long been our position that we will not substitute our judgment for that of the lower court on issues of witness credibility. *Waterhouse v. State*, 82 So. 3d 84, 106-07 (Fla. 2012)

- 11 -

(citing *Franqui v. State*, 59 So. 3d 82, 102 (Fla. 2011)); *see also Ibar v. State*, 190 So. 3d 1012, 1018 (Fla. 2016) (reasoning that postconviction courts "hold a superior vantage point" in observing the credibility of witnesses). We have also long observed that the testimony of a recanting witness is, "as a general matter, 'exceedingly unreliable.'" *Mosley v. State*, 209 So. 3d 1248, 1263 (Fla. 2016) (citing *Spann v. State*, 91 So. 3d 812, 816 (Fla. 2012)); *see also Archer v. State*, 934 So. 2d 1187, 1199 (Fla. 2006) (affirming denial of postconviction relief "because a recantation which is not credible would not produce an acquittal or a life sentence on retrial").

There was competent, substantial evidence to support the postconviction court's finding that Cottrell and Duranseau were not credible witnesses. As the postconviction court explained in its order denying relief, neither Cottrell nor Duranseau explained why they waited nearly forty years to make their recantations. *See Jones v. State*, 709 So. 2d 512, 521-22 (Fla. 1998) ("Where . . . some of the newly discovered evidence includes the testimony of individuals who claim to be witnesses to events that occurred at the time of the crime, the trial court may consider both the length of the

delay and the reason the witness failed to come forward sooner.").

At the evidentiary hearing, the law enforcement witnesses'

testimony contradicted Cottrell's and Duranseau's claims, as well

as the testimony of Duranseau's brother, Jones. *See Kight v.*

*Dugger*, 574 So. 2d 1066, 1073 (Fla. 1990) ("While there was

conflicting testimony concerning whether the state made

concessions in exchange for the informants' testimony, it was

within the trial court's discretion to find the state's witnesses more

credible than those of the defense."). Also, as the postconviction

court noted, Cottrell has nineteen prior felony convictions. *See*

*Sweet v. State*, 248 So. 3d 1060, 1067 (Fla. 2018) (considering the

recanting witness's seven felony convictions as part of competent,

substantial evidence analysis). The State's witness testimony at the

evidentiary hearing was consistent with and supported by the

record.[3] *See Waterhouse*, 82 So. 2d at 104 n.11 ("[A]ttorneys and

---

3. For example, Cottrell claimed at the evidentiary hearing that the State rented him a vehicle and a hotel room to testify at Rhodes's resentencing. Cottrell claimed that when he refused to testify as the State wished, the State opted to read his trial testimony to the jury. The record evidence contradicts Cottrell's claims, as the State's investigator testified at Rhodes's resentencing that Cottrell was unavailable because he was incarcerated in a

- 13 -

judges should be able to rely upon the veracity of a police report."). Before the affidavit in this case, Cottrell had consistently maintained that neither the State nor law enforcement had directed or encouraged him to secure incriminating information from Rhodes. *See Archer*, 934 So. 2d at 1198 (noting that before a recantation to the contrary, a witness's prior testimony consistently pointed to the defendant as the "mastermind of the crime"). And as for Duranseau, he did not claim at the evidentiary hearing that any of his trial testimony was false. *See Sweet*, 248 So. 3d at 1066 (concluding that there was no "true recantation" because the witness testified at the evidentiary hearing that her trial testimony was truthful).

For all these reasons, we conclude that competent, substantial evidence supports the postconviction court's finding that Cottrell and Duranseau were not credible. *See Waterhouse*, 82 So. 3d at 107 (finding competent, substantial evidence of incredibility based on the passage of time and the witness's acknowledgement that his memory was better at the time of the trial); *Sweet*, 248 So. 3d at

---

Daytona Beach prison.

1067-68 (finding competent, substantial evidence of incredibility where twenty-four years had passed and the witness was a seven-time convicted felon and inconsistent in his testimony).

**2.**

As for the second part of Rhodes's *Brady* claim, he alleges that the State failed to disclose material, favorable evidence related to law enforcement's fabrication of investigative reports. He argues that the evidence that "law enforcement falsified police reports" was not disclosed to trial counsel and was therefore suppressed. He also argues that this evidence was both favorable and material to his case. Rhodes further claims that because he has shown law enforcement's willingness to fabricate evidence, the other statements attributed to him should also be called into question. To support this claim, Rhodes presented the testimony of Niblack and Head, who, despite police reports to the contrary, testified that they never spoke to law enforcement.

As with Rhodes's other witnesses, the postconviction court found that both Niblack and Head were uncredible and rejected Rhodes's claim on that basis. We find that competent, substantial evidence supports that finding. Both Niblack and Head had

multiple prior felony convictions. *See Sweet*, 248 So. 3d at 1067.

There was also law enforcement testimony and record evidence

contradicting Niblack's and Head's claims. *See Clark v. State*, 35

So. 3d 880, 893 (Fla. 2010) (rejecting claim for postconviction relief

where the new testimony was not consistent with the evidence

presented at trial).

Detective Kelly, who interviewed Head, testified that he would

not include false information in a police report. The postconviction

court concluded that it was unclear what motivation Kelly would

have to put "minimally useful information in his police report,"

especially when the statements were easily verifiable and would

likely not have been admissible without Head's testimony. *See*

§ 90.802, Fla. Stat. (1985) (providing that hearsay evidence is

inadmissible). Detective Hauck, who interviewed Niblack, testified

at the evidentiary hearing that he would not have falsified an

interaction with a witness. In Hauck's report, he wrote that other

inmates in Rhodes's cell block declined to speak with him or denied

that Rhodes told them anything. It is not clear from Niblack why

Hauck would have falsified an interaction with just him. And the

rest of Hauck's report included statements consistent with witness

- 16 -

testimony at trial. *See Waterhouse*, 82 So. 3d at 104 n.11 ("[A]ttorneys and judges should be able to rely upon the veracity of a police report.").

For all the stated reasons, we find competent, substantial evidence supports the postconviction court's finding that Rhodes's witnesses lacked credibility. *See Mosley*, 209 So. 3d at 1259-63 (affirming the postconviction court's finding that the defendant's witnesses were not as credible as the State's witnesses).

Based on the findings that his witnesses lacked credibility, the postconviction court found that Rhodes had not established that exculpatory or impeaching evidence was willfully or inadvertently suppressed by the State, as required under *Brady*. *See Davis*, 26 So. 3d at 531 (providing what is required for a *Brady* claim). Since there was competent, substantial evidence to support this finding, we find that the lower court did not err in denying relief under *Brady*. *See Way v. State*, 760 So. 2d 903, 914-15 (Fla. 2000) (explaining that competent, substantial evidence supported trial court's finding that witness lacked credibility, and therefore defendant failed to establish *Brady* violation).

Even if we were to reject the postconviction court's

determination of witness credibility, Rhodes's claim would still fail because he cannot establish prejudice under *Brady*. To satisfy the prejudice prong of *Brady*, a defendant must show that the suppressed evidence was material. *Mordenti*, 894 So. 2d at 170 (citing *Allen v. State*, 854 So. 2d 1255, 1260 (Fla. 2003)). "Evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). We review the lower court's determination about materiality de novo. *Guzman v. State* (*Guzman I*), 868 So. 2d 498, 508 (Fla. 2003) (citing *Way*, 760 So. 2d at 913).

As the postconviction court explained, the remaining admissible testimony and evidence presented at trial was more than sufficient to support Rhodes's conviction. The evidence at trial established that the victim was last seen alive with Rhodes. A witness who lived with Rhodes at a safehouse testified that Rhodes was acting strange when he returned late that evening. That witness provided detectives with several pairs of Rhodes's pants; one pair had human blood on them. Rhodes's coworkers at a newspaper testified that he arrived late to work one morning, where

- 18 -

he told them that the police had detained him the previous night "because his girlfriend had been found strangled in a pile of lumber . . . [and] he had been driving her car." One of the coworkers testified that Rhodes had warned her not to go to bars because "strange things happen to girls at bars." She also testified that Rhodes said the victim should not "have been looking for Mr. Goodbar." The witness knew this statement to be a reference to the book "Looking for Mr. Goodbar," which is about a woman who was murdered by a man she picked up in a bar.

Rhodes's girlfriend at the time of the murder testified that she saw him the day after the victim was last seen. He was driving Nieradka's car, which he claimed he "bought from an older lady." Rhodes gave his girlfriend several items that he claimed to have found in a newly rented apartment; these items were later identified as belonging to the victim. His girlfriend also testified that on that same night, Rhodes placed his thumb on her throat and said, "Do you know how easy it would be to kill somebody by pushing right here?"

The next day, Rhodes was stopped while driving Nieradka's vehicle. He claimed that the vehicle belonged to his girlfriend. He

had a handwritten note granting him permission to drive the car; subsequent handwriting analysis revealed that Rhodes likely wrote the note. After law enforcement found Nieradka's body, Rhodes made several incriminating statements to them. When Detective Porter went to the Citrus County Jail to interview Rhodes, Rhodes said that he knew that Porter was there about a murder before he ever advised him of such. Rhodes attributed this knowledge to "having ESP." He later offered two other explanations— that his coworker had told him and that he had seen it in the news.

Rhodes offered other contradictory stories about the victim's death. He sometimes claimed that he was present for her death; other times he claimed that he found out about it afterward. He listed several different men as being responsible for the victim's death. In each story, he stated that the victim was killed at the Sunset Motel. Notably, however, the location of the victim's death was never released to the public, and law enforcement did not tell Rhodes.

Rhodes also referred to himself as a "vampire who preys on the lives of others." And at one point, he said that if law enforcement promised that he would spend the rest of his life in a mental health

facility he would tell them how the victim died. He then suggested that Nieradka died accidentally after a fall at the Sunset Motel. In addition to these statements, there were also two other jailhouse witnesses, John Bennett and Michael Allen, who never recanted their testimony that Rhodes made incriminating statements.

As for the penalty phase of Rhodes's trial, the State established four aggravating factors without the testimony of any jailhouse witnesses. Considering the ample evidence tying Rhodes to Nieradka's murder, the evidence that the jailhouse witnesses acted as state agents does not put the case in such a different light as to undermine confidence in the verdict. *See Way*, 760 So. 2d at 915 (articulating the standard for prejudice in these claims). Thus, we agree with the postconviction court that Rhodes failed to establish materiality under *Brady*. *See Franqui*, 59 So. 3d at 104 (concluding that there was no prejudice in the penalty phase because the recanted testimony only affected one aggravating factor).

**B.**

Next, Rhodes claims under *Giglio v. United States*, 405 U.S. 150 (1972), that the State violated his rights under the Fourteenth

Amendment by presenting and/or failing to correct false testimony. He claims that four witnesses—Cottrell, Duranseau, Allen, and Bennett—testified falsely at trial. All four witnesses testified at trial that there was no deal between them and the State. Allen and Bennett were also jailhouse informant witnesses, but neither recanted their testimony. Cottrell and Duranseau denied their prior testimony, which Rhodes argued "undermine[d] the reliability of the testimony of all four jailhouse agents." Rhodes further argues that Cottrell's and Duranseau's affidavits establish that the witnesses testified falsely.

To establish a *Giglio* claim, the defense must prove that (1) the State presented or failed to correct false testimony, (2) the State knew the testimony was false, and (3) the false evidence was material. *Guzman v. State* (*Guzman II*), 941 So. 2d 1045, 1050 (Fla. 2006) (quoting *Guzman I*, 868 So. 2d at 505). Under *Giglio*, the defense must first establish that the State knowingly presented or failed to correct false testimony. *Guzman I*, 868 So. 2d at 507. It is then the State's burden to establish "beyond a reasonable doubt that the knowing use of perjured testimony, or failure to disclose the perjury once it was discovered, did not affect the verdict."

*Guzman II*, 941 So. 2d at 1050-51. We apply a mixed standard of review to *Giglio* claims, deferring to the trial court's factual findings when they are supported by competent, substantial evidence, and reviewing the application of the law to those facts de novo. *Id.* at 1049-50 (citing *Suggs v. State*, 923 So. 2d 419, 426 (Fla. 2005)).

Any claims by Rhodes about Allen or Bennett are pure speculation, and we reject them. *See Wickham v. State*, 124 So. 3d 841, 855 (Fla. 2013) (finding that allegations of the State withholding evidence were "merely conclusory and speculative"). As for Cottrell and Duranseau, the postconviction court reiterated its finding that they lacked credibility. As we explained above, competent, substantial evidence supports that finding. *Green v. State*, 975 So. 2d 1090, 1107 (Fla. 2008) (concluding that there was competent, substantial evidence based on finding that one witness was more credible). Based on that finding, the postconviction court properly concluded that Rhodes failed to demonstrate that the State presented or failed to correct false testimony at trial. *See Hurst v. State*, 18 So. 3d 975, 992 (Fla. 2009) (finding no *Giglio* violation "[b]ased on the testimony presented and found credible at the

evidentiary hearing"). We therefore affirm the lower court's finding denying relief.

## C.

Next, Rhodes claims under *Massiah v. United States*, 377 U.S. 201 (1964), that the State violated his Sixth and Fourteenth Amendment rights by eliciting statements through state agents. He alleges that the State recruited Cottrell when he was a "trustee" at the Pinellas County Jail. He claims that Cottrell "expected something in return for his testimony against Rhodes." He claims that Duranseau was also in communication with law enforcement about Rhodes's case. At trial, Duranseau "acknowledged that his statements to law enforcement were coerced . . . but changed his story when questioned further on redirect [examination]." Rhodes further alleges that Allen and Bennett coordinated with the State. In sum, Rhodes claims that through Duranseau's and Cottrell's statements, he could prove that the State violated his right to counsel and used Cottrell, Duranseau, Allen, and Bennett as state agents to deliberately elicit information from him. Like Rhodes's other constitutional claims, we evaluate the postconviction court's factual findings for competent, substantial evidence, and review

legal conclusions de novo.  *See Johnson v. State*, 135 So. 3d 1002, 1026 (Fla. 2014) (applying the competent, substantial evidence standard to review of factual findings in a similar claim).

Once the right to counsel has attached, the Sixth Amendment prohibits law enforcement officers from deliberately eliciting statements from a defendant.  *Massiah*, 377 U.S. at 206.  But unlike the Fifth Amendment-based *Miranda* right to counsel, the Sixth Amendment right to counsel is offense-specific.  *Herard v. State*, 390 So. 3d 610, 621 (Fla. 2024), *cert. denied*, 145 S. Ct. 1315 (2025).  It attaches when a prosecution commences and cannot be invoked once for all future prosecutions.  *McMillian v. State*, 214 So. 3d 1274, 1285 (Fla. 2017) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)).

Here, Rhodes's right to counsel did not attach until he was arrested for Nieradka's murder on April 27, 1984, and transported to the Pinellas County Jail.  When the State allegedly elicited incriminating statements from Duranseau, Rhodes was in the Citrus County Jail for unrelated charges.  Because Rhodes's right to counsel had not yet attached, he cannot demonstrate a *Massiah* violation based on law enforcement's interview with Duranseau.

*See Rolling v. State*, 695 So. 2d 278, 290 n.8 (Fla. 1997) ("[T]he right to counsel must attach and be acknowledged by the accused before he or she receives the benefit of the Sixth Amendment protections set out in *Massiah*." (citing *Patterson v. Illinois*, 487 U.S. 285, 290-91 (1988))).

Rhodes also alleged that Allen and Bennett acted as state agents. But he did not present any evidence of this claim. Rather, he premised his allegation on Cottrell's and Duranseau's affidavits, arguing that their statements also showed that Allen and Bennett acted as state agents. There was no testimony at the evidentiary hearing by Allen or Bennett, nor any other factual evidence in support of Rhodes's claim. *See Suggs*, 923 So. 2d at 428 (rejecting a *Massiah* claim based on insufficient evidence partly because the alleged state agents did not testify at the postconviction evidentiary hearing). As the postconviction court explained, even if law enforcement did use Cottrell or Duranseau to elicit information from Rhodes, that finding would not establish that they used Allen or Bennett in the same manner. The postconviction court therefore properly rejected Rhodes's claim. *See id.* (citing *Lightbourne v. State*, 438 So. 2d 380, 386 (Fla. 1983)).

Finally, as for Cottrell, the postconviction court rejected Rhodes's claim based on its credibility determination, concluding that Rhodes failed to establish that the State deliberately elicited incriminating statements. As explained under the other constitutional claims, competent, substantial evidence supports the postconviction court's factual finding. *See Johnson,* 135 So. 3d at 1026 (rejecting a *Massiah* claim when the postconviction court's finding about a witness's credibility was supported by competent, substantial evidence). We therefore affirm the lower court's denial of this claim.

## D.

Finally, Rhodes argues that even if his constitutional claims fail, the witness affidavits constitute newly discovered evidence and entitle him to a new trial. To obtain relief based on newly discovered evidence, a defendant must establish that (1) the evidence was unknown at the time of trial and could not have been discovered through due diligence and (2) the evidence is of such a nature that it "would probably yield a less severe sentence on [retrial]." *Brown v. State,* 304 So. 3d 243, 272-73 (Fla. 2020) (quoting *Swafford v. State,* 125 So. 3d 760, 767 (Fla. 2013)); *see*

- 27 -

*also Jones*, 709 So. 2d at 521 (establishing the two-part test to set aside a conviction based on newly discovered evidence).

We have long observed that witness recantations are "exceedingly unreliable" and exercise caution in assessing them. *Johnson v. State*, 769 So. 2d 990, 998 (Fla. 2000) (quoting *Bell v. State*, 90 So. 2d 704, 705 (Fla. 1956)); *see also Robinson v. State*, 707 So. 2d 688, 691 (Fla. 1998) (noting that recanted testimony may be unreliable and stressing caution). A postconviction court has a duty to deny a new trial if it is not satisfied that the recanting testimony is true, especially if it involves a confession of perjury. *Armstrong v. State*, 642 So. 2d 730, 735 (Fla. 1994) (quoting *Bell*, 90 So. 2d at 705). Moreover, when a newly discovered evidence claim relies on an admission of perjury, which it does in this case, the issue of credibility arises. *Archer*, 934 So. 2d at 1196. We are highly deferential to the lower court's judgment on issues of credibility. *Id.* (first citing *Johnson*, 769 So. 2d at 1000; and then citing *Robinson v. State*, 865 So. 2d 1259, 1262 (Fla. 2004)). As explained under the constitutional claims, competent, substantial evidence supports the lower court's finding that Cottrell and

Duranseau were not credible.[4]  We therefore affirm the lower court's finding.

The postconviction court's finding that the "newly discovered evidence" was not of such a nature that it would probably produce an acquittal on retrial was also not in error.  To make this determination, the lower court is required to " 'consider all newly discovered evidence which would be admissible' at trial and then evaluate the 'weight of both the newly discovered evidence and the evidence which was introduced at the trial.' "  *Robinson*, 865 So. 2d at 1262 (quoting *Jones*, 709 So. 2d at 521).  In this case, the lower court properly considered the other evidence presented in trial, as well as the context and history of Cottrell and Duranseau as witnesses.  *Id.* at 1263 (citing *State v. Spaziano*, 692 So. 2d 174, 178 (Fla. 1997)).  We therefore affirm the lower court's finding that Rhodes is not entitled to relief.

---

4.  A claim of newly discovered evidence must be supported by affidavits.  Fla. R. Crim. P. 3.851(e)(2)(C).  We therefore reject any claims by Rhodes about Allen or Bennett, who did not submit affidavits.  *Gonzalez v. State*, 253 So. 3d 526, 528 (Fla. 2018) ("Mere speculation is not sufficient to form the basis for postconviction relief." (quoting *Ellerbee v. State*, 232 So. 3d 909, 918 (Fla. 2017))).

## III.

For the reasons stated, we affirm the trial court's denial of Rhodes's successive motion for postconviction relief.

It is so ordered.

COURIEL, C.J., and LABARGA, MUÑIZ, GROSSHANS, FRANCIS, SASSO, and TANENBAUM, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Pinellas County,
    Joseph Anthony Bulone, Judge
    Case No. 521984CF003982AXXXNO

J. Jervis Wise of Brunvand and Wise, P.A., Clearwater, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, and Timothy A. Freeland, Senior Assistant Attorney General, Tampa, Florida,

    for Appellee

- 30 -